**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                              3:09-cr-131-J-20MCR

JAMES CHARLES JONES, SR.
NICOLE MARIE HOGAN
_____

# REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendants' Joint Motion to Suppress (Doc.

56) filed July 7, 2009. The Government filed a response in opposition to the Motion on

August 7, 2009 (Doc. 67). On September 7, 2009, Defendants filed a supplemental

memorandum addressing the issue of standing. (Doc. 72). After two continuances, an

evidentiary hearing was held before the undersigned on September 29, 2009.

## I.  Evidence Presented at the Hearing

During the hearing, the Government presented the testimony of several law

enforcement officers participating in a narcotics investigation on April 17, 2009, which

lead to the arrest of the Defendants: Special Agent Troy Clausen with the United States

Immigration and Customs Enforcement Agency ("ICE"), Detective Thomas Swart with

the Putnam County Sheriff's Office, Agent Allen Ciolkosz, an air enforcement agent with

the U.S. Customs Border Protection, Detective Randy Crews with the Baker County

Sheriff's Office, Detective Timothy Campbell with the Putnam County Sheriff's Office,

_____

[1]  Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule
6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after
service of this document.  Failure to file timely objections shall bar the party from a de novo
determination by a district judge and from attacking factual findings on appeal.

and Special Agent Bruce Savell with the Drug Enforcement Agency ("DEA").  Special

Agent Troy Clausen with ICE testified that on the morning of April 17, 2009, he and

some confidential sources, who had previously provided reliable information, were

planning a meeting with an individual only known as Noelle to observe a quantity of

cocaine for a future purchase.  (Tr. 109:10-25).  As of the morning of April 17, 2009,

Special Agent Clausen only knew the meeting would take place somewhere in Palatka,

Florida.  He did not have a specific location.  (Tr. 110:4-9).  The confidential sources

were provided with a recording device so law enforcement could listen to conversations

with the drug trafficker.  (Tr. 111:2-6).  On the morning of April 17, 2009, the confidential

sources were directed to meet with Noelle at a gas station in Palatka.  Shortly after they

arrived, an individual, later identified as Defendant, Albertano Hernando-Sanchez

("Sanchez"), pulled up in a white Malibu and met with them.  (Tr. 112:18-23).  Sanchez

instructed the confidential sources to follow him to another location.  (Tr. 112:24-25,

113:1).  They followed Sanchez to a parking area outside 230 San Jose Avenue.  (Tr.

118:8-11).  At this point, no ground units were able to provide surveillance due to the

layout of the neighborhood, and the officers were relying on the aircraft to conduct

surveillance.  (Tr. 118:12-25, 119:1-2).

    Agent Ciolkosz, an air enforcement agent with the U.S. Customs Border

Protection, testified that he participated in the April 17, 2009 investigation by providing

air support for the officers on the ground.  (Tr. 91-92).  He stated that for surveillance, a

height of 10,000 feet and a distance of three miles is usually optimal.  (93:1-6).  Agent

Ciolkosz testified that on April 17, 2009, it was cloudy and that posed a problem for air

surveillance. (Tr. 96:20-24). Because of the cloud cover, the aircraft had to fly below 5,000 feet and got as close as 2.2 miles from the house. (Tr. 97:4-5, 98:20-22). Agent Ciolkosz admitted that it did not appear any of the suspects had seen the aircraft and it would have been difficult for them to have spotted it. (Tr. 104:16-20).

While still outside 230 San Jose Avenue, the confidential sources and Sanchez proceeded to discuss the cocaine. Sanchez told the sources that the cocaine was very close, not even a block away, and instructed them to leave for about fifteen minutes to await his call. (Tr. 119:10-13, 121:14-22, 236:22-24). After the confidential sources departed, law enforcement felt it was possible to bring a vehicle into the neighborhood to conduct ground surveillance. Therefore, two officers, Detectives Crews and Campbell, took up a location from which they could see the front of the 230 San Jose Avenue, as well as the house next door, 228 San Jose Avenue. (Tr. 123:18-23, 189:21-24). Both Detectives testified they observed several individuals walking between the two houses. (Tr. 190:9-13, 216:14-18). Detective Crews explained that he could see the individuals walking in front of the houses, but that from his vantage, he could not actually observe them enter into the homes. (Tr. 192:4-13).

At approximately 10:43 a.m., Sanchez phoned the confidential sources and told them it would be a little longer, perhaps twenty minutes. (Tr. 126:6-15). During this same time, the officers conducting surveillance on the homes noted a lot of activity between 230 San Jose Avenue and 228 San Jose Avenue. Specifically, they observed the white Malibu pull out of the 230 residence and back into the driveway in front of 228. (Tr. 126:22-25, 127:1-6). At the same time, a black pick-up truck, driven by Defendant

Jones, arrived. (Tr. 127:7-14). The black pick-up pulled up in front of 228 and individuals came out of 228 to speak with the driver. (Tr. 192: 22-25, 193:1-7, 217:4-9). The white Malibu then pulled out of 228 and onto the road while the black truck backed up to the residence at 228 for a short period of time. (Tr. 193:9-13). The white Malibu then returned to 228. (Tr. 193:13-14). The black truck then drove around the block and then pulled into 230. (Tr. 193:15-24).[2] After the black truck returned to 230, the white Malibu pulled out of 228 and backed into 230. (Tr. 195:12-19). Detective Crews stated that as the Malibu backed into 230, he was no longer able to see it. (Tr. 196:2-5).

Shortly after this, at 11:27 a.m., Sanchez again contacted the confidential sources and told them to come back to 230 San Jose Avenue. (Tr. 128:6-11). Around 11:30 a.m., the confidential sources arrived at 230 San Jose and were shown fifty (50) kilograms of cocaine. (Tr. 129:3-5). The sources reported to Special Agent Clausen that Sanchez and a black male were in the home and that they believed a third individual was in another room of the home. (Tr. 130:9-17). The sources offered to pay $1.5 million for the cocaine. Special Agent Clausen originally testified that he believed the confidential sources told Sanchez they would have to go get the money in Lake City (Tr. 136:13-18), however, later, he testified the confidential source told Sanchez he would be returning in ten minutes. (Tr. 159:21-22).

---

[2] Special Agent Clausen and Detective Campbell testified that based on their training and experience, this move by the black pick-up was an effort at counter-surveillance. (133:1-5, 217:18-25, 218:1-6).

Special Agent Clausen explained that after the sources were shown the cocaine, officers decided to enter the residences in order to secure them because they were concerned that with such a large amount of cocaine, Sanchez would move it. (Tr. 131:14-25, 132:4-10). Additionally, the number of cars parked around the home posed a risk and it would be impossible for the officers to follow the cars should they attempt to depart. (Tr. 133-134). The agents made entry into the homes at 11:52 a.m., approximately six minutes after the confidential sources left 230. (Tr. 137:1-5). Approximately ten minutes after the entry, Special Agent Clausen and Detectives Swart and Campbell left to obtain the warrants. (Tr. 139:8-19). After he returned with the warrants, Special Agent Clausen interviewed Defendant Hogan (Tr. 139:24-25, 140:1-4). Prior to the warrant being returned, Special Agent Savell interviewed Hogan. (Tr. 143:1-3).

Special Agent Bruce Savell with the DEA testified he was involved with the entry and securing of 228. (Tr. 241:20-25). Special Agent Savell stated that no search was conducted of 228 when it was secured. Instead, officers entered the residence, securing the occupants and then "backed out of the residence." (Tr. 242:1-7). While the search warrants were being obtained, Special Agent Savell interviewed Defendant James Jones and another individual, Kory Smith. (Tr. 242:19-24). During the interview, Defendant Jones did not state he lived at 230 and stated he had not been in 228. (Tr. 244:4-19). On cross-examination, Special Agent Savell clarified that Defendant Jones may have said he had not been in 228 on April 17, not that he had never been to 228. (Tr. 245:7-19).

Defendants presented the testimony of two witnesses to assist in establishing standing. First, Defendant, James Charles Jones, Sr.'s daughter, Jakeida Jones Mack, testified she was the deed holder of 230 San Jose Avenue, but that her father paid a portion of the mortgage, the utilities, and cable. (Tr. 13: 22-25, 14:1-5).[3] She also claimed her father was responsible for the maintenance at 230 San Jose. (Tr. 14:6-8). She further testified that her father maintained a room in that house, stayed there approximately three nights a week, and had a girlfriend, Defendant Hogan, who also stayed at the house. (Tr. 14:14-23). Ms. Mack stated she gave her father full control of the property and therefore, he had the right to exclude others from the home. (Tr. 18:6-8, 16-21).

Defendants also presented the testimony of Robbi Haddad, another resident of 230 San Jose Avenue. Ms. Haddad testified she lived at 230 San Jose Avenue and had been living there for a little over a year. (Tr. 21:1-2). She stated she had an arrangement with Defendant Jones and was permitted to live in the home and was to assist with taking care of Mr. Blocker, a seventy-nine year-old man who was renting the home from Defendant Jones's daughter. (Tr. 37:15-22). Ms. Haddad also stated that sometimes Defendant Jones and Defendant Hogan stayed at the house and shared a room because they were boyfriend and girlfriend. (Tr. 21:4-13). She testified Jones left clothes and "personal stuff" at the home, as well as the trailers for his lawn business. (Tr. 24:1-3). Ms. Haddad testified that sometime in March 2009, Defendants Jones and

---

[3] References to the transcript of the evidentiary hearing conducted on September 29, 2009, will be "Tr. Page number : line number(s)."

Hogan rented 228 San Jose and would divide their time between the two homes. (Tr. 25:14-25, 26:1-9). She explained that while Hogan's name was on the lease at 228, Jones paid the rent because Hogan did not have a job and had no money. (Tr. 30:22-25, 31:1-4). According to Ms. Haddad, Defendant Hogan never fully moved out of 230 because she still kept clothing and furniture at 230. (Tr. 27:7-12, 31:10-15). Ms. Haddad stated that Defendants posted a sign on 228 telling people not to disturb them as Ms. Haddad had walked in on the Defendants during "personal times." (Tr. 32:19-25, 36:17-22).

Ms. Haddad also testified that she was present in 228 on April 17, 2009, the day the officers searched the homes. (Tr. 39:17-25). She stated the individuals inside 228 were all hand-cuffed with white straps and were taken outside while the officers waited for a search warrant. (Tr. 41:15-23). Ms. Haddad further claimed she heard officers going through drawers, running water, and opening the refrigerator while she and the other occupants were outside. (Tr. 42:3-19, 50:16-17, 51:2-3).

## **II. Analysis**

Defendants seek to suppress all evidence taken during the searches of the two residences in East Palatka, Florida on April 17, 2009. Defendants argue the law enforcement officers illegally entered the two homes and detained the occupants while waiting to get search warrants. Defendants do not contest probable cause existed to search the residence at 230 San Jose Avenue, however, Defendants take the position that in order for the officers to have legally entered the property before they had the search warrants, they needed both probable cause and exigent circumstances.

Defendants contend no exigent circumstances were present. Additionally, Defendants take the position that probable cause did not exist for the search of 228 San Jose Avenue. Finally, Defendants ask that the statements they made to officers on April 17, 2009 be suppressed as fruit of the poisonous tree.

The Government responds that Defendant Jones does not have standing to challenge the entries into either 228 or 230 and Defendant Hogan has no standing with respect to 230. Next, the Government argues it was not required to show exigent circumstances as it merely secured the residence and did not conduct a search until the search warrants were obtained. Alternatively, the Government takes the position that exigent circumstances were present at the time the officers entered the two homes. Finally, the Government argues that even if no exigent circumstances were present, the evidence seized should not be suppressed under the independent source doctrine. The Court will address each of these arguments separately.

**A.     Standing**

As an initial matter, the Court will first address the Government's contention that Defendants do not have standing to challenge the entries and searches at 228 and 230 San Jose Avenue. The Fourth Amendment protects individuals from unreasonable searches and seizures by government agents. Only persons who actually enjoy a reasonable expectation of privacy have standing to challenge the validity of a government search. Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421 (1978). To have standing to challenge a search, a person "must manifest a subjective expectation of privacy in the invaded area that 'society is prepared to recognize as reasonable.'"

United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) (quoting Rakas, 439 U.S. at 143, n. 12).  The person who challenges a search bears the burden of proving standing.  Id.

Here, the Government takes the position that Defendant Jones did not have standing to challenge the police conduct with respect to either 228 or 230 and that Defendant Hogan did not have standing with respect to 230.  The Government introduced Defendant Jones's Monthly Supervision Reports from the Probation Office, which indicated Mr. Jones lived at 23 Ranwood Lane in Palm Coast, Florida.  (See Government's Exhibit 20).  Even if Jones did not live at either 228 or 230 San Jose Avenue, he nevertheless can establish a legitimate expectation of privacy by demonstrating "'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.'"  United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (citing United States v. Bachner, 706 F.2d 1121, 1126 n. 6 (11th Cir. 1983)).  Defendant presented sufficient evidence of such with respect to 230 San Jose Avenue.

During the suppression hearing, Defendant Jones's daughter, Ms. Mack, testified that she was the deed holder of 230 San Jose Avenue but that her father paid a portion of the mortgage, the utilities, and cable.  (Tr. 13: 22-25, 14:1-5).  She claimed her father maintained a room in that house, stayed there approximately three nights a week, had a girlfriend, Defendant Hogan, who also stayed at the house, and was responsible for the maintenance at 230 San Jose.  (Tr. 14:6-8, 14-23).  Ms. Mack testified she gave her father full control of the property and therefore, he had the right to exclude others from

the home.  (Tr. 18:6-8, 16-21).  The undersigned finds this testimony sufficient to establish that Defendant Jones has standing with respect to 230.  Moreover, this testimony, coupled with some of the testimony from Ms. Haddad, is sufficient to establish standing for Hogan with respect to 230 as Hogan was Jones's girlfriend, was an overnight guest at 230 from time to time, and left some personal items at 230.  See Minnesota v. Carter, 525 U.S. 83, 90-91, 119 S.Ct. 469, 474 (1998) (even an overnight guest can establish a reasonable expectation of privacy in a third party's house if the individual demonstrates that he/she is a guest on the premises for a personal occasion, rather than strictly a commercial purpose);

During the hearing, counsel for the Government admitted that the evidence presented by Defendants, if believed, would be sufficient to establish standing.  The Government intimated that the witnesses were not credible.  The Court, having observed both Ms. Mack and Ms. Haddad's demeanor while testifying and having considered their interest in the outcome of the case, their responses to questions on direct and cross-examination, and the consistencies or inconsistencies in their testimony, finds Ms. Mack's testimony to be credible and Ms. Haddad's to be somewhat less credible.  Specifically, the Court does not find Ms. Haddad's testimony regarding officers rummaging around 228 while waiting for the search warrant to be credible.  Ms. Haddad appeared to be particularly uneasy and jittery while giving this testimony. Additionally, her testimony was contradicted by Special Agent Savell who testified that no search was conducted of 228 when it was secured.  Instead, officers entered the residence, securing the occupants and then "backed out of the residence."  (Tr. 242:1-

7).  The Court found Special Agent Savell to be particularly credible because he was willing to make admissions which were against the Government's interest.  In particular, Special Agent admitted that Defendant Jones may have said he had not been in 228 on April 17, not that he had never been to 228.  (Tr. 245:7-19).

With these findings in mind, the Court believes Defendants have presented sufficient evidence that Jones had an expectation of privacy at 228 as well.  Ms. Haddad testified Defendant Jones spent several nights a week at 228 with Hogan.  (Tr. 25-26).  She also testified he paid the rent for Hogan, as Hogan was currently unemployed and did not have any money.  (Tr. 30:22-25, 31:1-4).  While the Court did not find Ms. Haddad to be an entirely credible witness, her testimony regarding Jones staying over at 228 appears to be buttressed by the inventory of seized items for 228. (Doc. 67, Ex. C).  In the inventory, it appears officers seized a pill bottle containing "Watson 540" pills and bearing the name of Defendant Jones.  Id.  The fact that Jones left a pill bottle containing pain medication at 228 may indicate that he spent time there and left personal effects there.  The undersigned is also persuaded by Defendants' exhibit number 3, a sign purportedly on the door of 228 telling others not to disturb from "Charles and Nicki," the Defendants.  This sign indicated both Defendants had the right to exclude others from 228.

With respect to 228, the Government argues Defendant abandoned any privacy interest in 228 by telling officers he had never been to 228 (Doc. 67, p.13), however, during the hearing, Special Agent Savell acknowledged that he was not certain Jones denied ever being in 228.  Special Agent Savell admitted that Jones may have simply

denied having been inside 228 on the specific day of the search. (Tr. 245:7-19). Accordingly, the undersigned finds Jones did not abandon any privacy interest in 228.

This does not appear to be a case where Defendants' only relationships with the homes were for business purposes. Both Defendants were overnight guests at the homes, maintained personal effects in the homes, and appeared to have the ability to exclude others from the homes. Therefore, the undersigned finds the Defendants had standing to challenge the warrantless entries into 228 and 230 San Jose Avenue.

**B.    The Warrantless Entry Into the Homes**

The Government takes the position that the entry into the two homes prior to obtaining search warrants was simply an effort to secure the premises and therefore, was not an unreasonable seizure or a search. The Government argues it was not necessary to establish exigent circumstances to first enter the home and remove the occupants while waiting for the search warrants. Defendants, on the other hand, argue that the initial entry into the homes required both probable cause and the presence of exigent circumstances, that the Government cannot establish exigent circumstances with respect to either property, and cannot establish probable cause for 228 San Jose Avenue.

Accordingly, to evaluate whether the officers were justified in the initial entry of the homes, the Court must first determine whether officers had probable cause to believe the homes contained evidence of a crime. Next, the Court must determine whether it was necessary for exigent circumstances to exist before the officers could enter and secure the homes while they waited for the search warrant. If so, the Court

must then analyze the facts to evaluate whether such exigent circumstances were present.

1.   **Probable Cause**

As Defendants concede there was probable cause to believe the home at 230 San Jose Avenue contained contraband (Doc. 57, p.1), the Court need not consider that issue.  However, Defendants do dispute the existence of probable cause with respect to 228 San Jose Avenue.

Probable cause exists when under the "totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).  In other words, probable cause exists "where the facts lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime.'"  United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983) (quoting United States v. Rojas, 671 F.2d 159, 165 (5th Cir. Unit B 1982)).

In the present case, law enforcement observed a white Malibu driven by one of the defendants, Sanchez, meet with the confidential sources at a gas station.  The confidential sources were told to follow Sanchez to a different location.  The confidential sources followed Sanchez to 230 San Jose Avenue and met with him outside the house.  The sources were told the drugs were very close, less than a block away, and would be arriving shortly.  (Tr. 119:10-13, 121:14-22, 236:22-24).  The confidential sources were directed to leave for about fifteen minutes and Sanchez would call them

when the drugs arrived.  Accordingly, the sources left 230 San Jose to wait for a call from Sanchez.

At this point, Detectives Crews and Campbell arrived in the neighborhood and were able to conduct visual surveillance on the two houses at 230 and 228 San Jose Avenue.  Shortly after the confidential sources left 230 San Jose, the white Malibu moved to back into 228 San Jose (Tr. 126:22-25, 127:1-6) and a black pick-up truck, driven by Defendant Jones, arrived (Tr. 127:7-14).  The black pick-up pulled up in front of 228 and individuals came out of 228 to speak with the driver.  (Tr. 192: 22-25, 193:1-7, 217:4-9).  The white Malibu then pulled out of 228 and onto the road while the black truck backed up to the residence at 228 for a short period of time.  (Tr. 193:9-13).  After the black truck pulled out of 228, the white Malibu returned to 228.  (Tr. 193:13-14).  The black truck departed from 228, drove around the block, and then pulled into 230.  (Tr. 193:15-24).  After the black truck returned to 230, the white Malibu pulled out of 228 and backed into 230.  (Tr. 195:12-19).

The Court believes the actions of these vehicles backing into 228 and then into 230, coupled with the statement by Sanchez that the cocaine was "less than a block away," and the fact that shortly after the vehicles did this switch, the confidential sources received a call from Sanchez indicating the cocaine had arrived, was sufficient to give the officers probable cause to believe that the cocaine had been at 228 and was moved to 230.  The movement of the white Malibu from 230 to 228 and then back to 230 is very peculiar.  The homes were at most 25 to 30 feet from each other.  (Tr. 257:1-5).  Additionally, Special Agent Clausen testified he believed that if the drugs had

been in 230 when the confidential sources were originally brought to the property,

Sanchez would have gone ahead and shown them the drugs.  (Tr. 134:16-20).

Accordingly, he believed the drugs had been brought to 230 after the confidential

sources were first brought to 230 but prior to Sanchez calling the sources to return.

While the officers admitted they never observed anyone carrying any packages to or

from 228 or 230, Detective Crews testified that from his surveillance vantage point, it

was not possible to observe individuals actually entering the homes, so it is likely he

would not have been able to see if someone were to unload a package from a vehicle.

(Tr.192:4-13, 196:2-5).  The fact that the vehicles were backing into both properties also

supports the belief that individuals could have been moving large, heavy items from one

home to another.  At the very least, the officers saw numerous individuals traveling

between 228 and 230, observed vehicles moving back and forth between 228 and 230,

and had reason to believe that the two homes were occupied by individuals participating

in the upcoming drug sale.  Therefore, it was reasonable for the officers to believe 228

would contain evidence of a crime and there was probable cause to enter the residence.

> **2.    Must Exigent Circumstances Be Present**

To support its argument that it was not necessary to establish exigent

circumstances, the Government cites to <u>Segura v. United States</u>, 468 U.S. 796, 104

S.Ct. 3380 (1983).  The Government claims <u>Segura</u> distinguished between a search of

a dwelling and a seizure of a dwelling to preserve the status quo and held that "securing

a dwelling on the basis of probable cause, to prevent the destruction or removal of

evidence while a search warrant is being sought is not itself an unreasonable seizure of

either the dwelling or its contents." (Doc. 67, p.15). Interestingly, the portion of the

Segura decision cited by the Government is in a section of the opinion joined in by only

two Justices. Additionally, this Court notes that the portion of Segura relied upon by the

Government has been sharply criticized. See United States v. Wright, 696 F.Supp. 164,

170, n.8 (E.D. Va. 1988) (citing Dressler, A Lesson in Incaution, Overwork, and Fatigue:

The Judicial Miscraftsmanship of Segura v. United States, 26 Wm. & Mary L.Rev. 375,

422 (1985) ("Segura is a disaster as a written opinion"); Note, The Securing of the

Premises Exception: A Search for the Proper Balance, 38 Vand.L.Rev. 1589 (1985)

("The most distressing feature of Segura is that the Chief Justice has created an

exception [to the warrant requirement] without identifying any corresponding need"));

see also 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment

§6.5(c), pp. 417-424 (4th ed. 2004).

In Search and Seizure, Professor LaFave suggested that the Segura Court did

not really approve of warrantless entry absent exigent circumstances. Id. at 419. He

noted that the majority "parse[d] the police conduct in Segura into its 'seizure' and

'search' components, and with respect to the 'seizure' part [was] not really taking into

account the fact of entry." Id. To support this proposition, LaFave quoted the following

passage in Segura:

> Securing of the premises from within, however, was no more
> an interference with the petitioners' possessory interests in
> the contents of the apartment than a perimeter "stakeout." In
> other words, the initial entry-legal or not-does not affect the
> reasonableness of the seizure. Under either method-entry
> and securing from within or a perimeter stakeout-agents
> control the apartment pending arrival of the warrant; both an

> internal securing and a perimeter stakeout interfere to the
> same extent with the possessory interests of the owners.

Id. at 419-20 (quoting Segura, 468 U.S. at 811, 104 S.Ct. at 3389).  LaFave noted that

the Segura Court "only said that the *seizure* aspect (which, were it to exist in isolation,

would mean maintaining control without entry) is permissible on probable cause even if

there are not exigent circumstances."  Id. at 420.  LaFave elaborated that the four

dissenters appeared to agree on that point as they stated they assumed "impoundment

would be permissible even absent exigent circumstances if it occurs 'from the outside' –

when the authorities merely seal off premises pending the issuance of a warrant but do

not enter."  Id. (quoting Segura, 468 U.S. at 824, n. 15, 104 S.Ct. at 3396).

This Court is persuaded by the analysis provided by LaFave.  Moreover, given

the criticism of Segura, and the fact that this Court was unable to locate (and the

Government did not cite) any Eleventh Circuit cases adopting the holding cited by the

Government[4], the Court finds the Government must show both probable cause and

exigent circumstances existed at the time the officers entered the homes at 228 and

230 San Jose.  As such, the Court must next determine whether exigent circumstances

supported the officers' decision to enter the two homes.

---

[4] Indeed, in United States v. Morales, 868 F.2d 1562, 1575 (11th Cir. 1989), the Eleventh Circuit referenced Segura and the distinction between a search and a seizure by noting that the conduct of the DEA agents in simply seizing the home was less intrusive than an actual search, however, the court still found that in order to justify any warrantless **entry**, probable cause and exigent circumstances must be present.  Moreover, two of the cases cited by the Government as supporting its position that it only needed probable cause to secure the homes are inapposite.  In United States v. Mendoza-Burciaga, 981 F.2d 192, 197 (5th Cir. 1992), the court found exigent circumstances existed and in United States v. Taylor, 248 F.3d 506, 511 (6th Cir. 2001), law enforcement obtained the defendant's consent to enter the apartment.

### 3. Were Exigent Circumstances Present in this Case?

Warrantless searches are per se unreasonable under the Fourth Amendment, but are subject to specific exceptions. Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412 (1978). The exigent circumstances exception to the warrant requirement provides that a "warrantless entry by criminal law enforcement officials may be legal where there is a compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949-50 (1978); Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371 (1980). Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983). Clearly the officers in this case were concerned about the possible destruction, removal, or concealment of evidence.

Regarding destruction of evidence, the Eleventh Circuit has determined "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991). "The mere presence of contraband, however, does not give rise to exigent circumstances." United States v. Lynch, 934 F.2d 1226, 1232 (11th Cir. 1991). Rather, "the appropriate inquiry is whether the facts . . . would lead a reasonable, experienced [officer] to believe that evidence might be destroyed before a warrant could be secured." Tobin, 923 F.2d at 1510. The Government bears the burden of proving that the agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless

entry into the homes.  United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995)

(citing Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032 (1971)).

However, "exigent circumstances will not justify warrantless entry if the exigency was

created by those conducting the search."  United States v. McGregor, 31 F.3d 1067,

1069 (11th Cir. 1994).

Here, the Government asserts that agents feared the immediate destruction of

evidence for several reasons, such as: the vulnerable surveillance position (including

the compromised position of the air surveillance and the counter-surveillance moves

conducted by the suspects), the observation of numerous individuals moving between

the two homes, the number of vehicles present and the lack of police resources to

follow those vehicles should they depart, the large quantity of drugs at the home and the

steps taken to conceal it (including the known practice of drug traffickers to move drugs

after an initial display), the suspected presence of firearms, and the suspects'

expectation that the confidential sources would return with the money in ten minutes.

(Doc. 67, pp. 20-21).  Defendants respond that there was no indication the suspects in

either 230 or 228 had any idea they were under police surveillance and therefore,

United States v. Santa, 236 F.3d 662 (11th Cir. 2000) dictates no exigent circumstances

were present.

The Court will examine each of the bases for exigency offered by the

Government.  First, the Government takes the position that the presence of exigent

circumstances was supported by the difficulty in conducting surveillance, including the

potential for the suspects to observe the airplane surveillance and the counter-

surveillance undertaken by Defendant Jones.  The Court is not convinced these factors

support a finding of exigent circumstances.  As an initial matter, the Eleventh Circuit has held that a warrantless entry will not be supported by the police's inability to maintain effective surveillance.  Lynch, 934 F.2d at 1233, n.4.

As for the Government's contention that the compromised position of the air surveillance unit and the fact that ground agents could see and hear the activities of the air surveillance unit, the Court likewise does not believe such supports a finding of exigency.  There was no evidence that any of the suspects were aware of the air surveillance.  The case cited by the Government, United States v. Rush, 248 F.Supp.2d 1121, 1124 (M.D. Ala. 2003) is not on point.  In that case, the officers were aware of at least one individual who knew of the air surveillance.  Id.  Here, there was no indication the suspects knew they were under surveillance.

Indeed, the Government presented no evidence that the suspects were aware of any of the surveillance.  No officers testified that the suspects saw them and there was no evidence that the suspects engaged in any conduct indicating they were aware they were being watched.  Special Agent Clausen admitted that there was no indication that any of the suspects had any idea they were under surveillance.  (Tr. 150:19-23).  The Government believes the fact that Defendant Jones was observed driving around the block and the officers testified they believed this was an effort at counter-surveillance, supports a finding of exigency.  The Government cites United States v. Villabona-Garnica, 63 F.3d 1051 (11th Cir. 1995) for the proposition that law enforcement's observation of what could have been counter-surveillance supported a finding of exigency.  (Doc. 67, p.20).  However, in Villabona-Garnica, the court was not persuaded by the mere fact that counter-surveillance may have taken place.  Instead, the court

believed exigent circumstances were present because officers could have believed that a fifth individual, who was not apprehended with the other four suspects when they left the home, could have been engaging in counter-surveillance, became aware of the police presence, and remained in the home to destroy the drugs. Id. at 1056. Accordingly, in Villabona-Garnica, there was some basis to believe an individual may have been aware of the police presence and was in the process of destroying the drugs. Here, Defendant Jones's attempts at counter-surveillance occurred prior to the confidential sources being phoned to return for the transaction. As a result, the officers could be sure they were not observed at that point. Certainly, if Jones had seen any police presence, the sale would not have continued. Accordingly, without more, the mere fact that the suspects engaged in what appeared to be counter-surveillance is not sufficient to show exigent circumstances.

Courts in this circuit have repeatedly found that circumstances are not normally considered exigent where the suspects are unaware of police surveillance. Santa, 236 F.3d at 669-70, Tobin, 923 F.2d at 1511, Lynch, 934 F.2d at 1232. The Lynch court observed:

> Suspects who are inside their homes and unaware of their impending arrests generally have no reason immediately to flee, nor would they ordinarily have any reason immediately to destroy the fruits of their crime. Likewise, without more there is little reason for them to endanger the lives of themselves or others. Consequently, law enforcement officers confronting this type of situation can, without great difficulty, maintain surveillance of the premises and either wait to effectuate a valid public arrest when the suspects emerge or seek an arrest warrant from a neutral and detached magistrate.

Lynch, 934 F2d at 1232-33 (quoting United States v. George, 883 F.2d 1407, 1413-14 (9th Cir. 1989)).  Similarly, in the present case, the officers observed no conduct by the suspects indicating they were aware of the surveillance and as such, the suspects had no reason to immediately flee or destroy the fifty kilos of cocaine.

The remaining factors relied upon by the Government also do not support a finding of exigency.  For example, the Court does not believe the observation of numerous individuals moving between the two homes supports a finding of exigency.  There was no evidence presented that these individuals were carrying anything nor was there any evidence that any individuals ever attempted to leave the area around the two properties.  Even if the individuals had been observed carrying items, at the time the officers made their entry, they had already determined they would be securing both 228 and 230, so the fact that items might have been carried from one home to the other would not be relevant.  Additionally, there was no evidence that any of the individuals were behaving in a suspicious manner or in a way that indicated they were aware they were being watched.

Additionally, the suspected presence of firearms is not a sufficient basis for finding exigent circumstances.  The Government presented no evidence that the confidential sources observed any firearms when they entered 230, nor was there any testimony that either the airplane surveillance or the ground surveillance witnessed the presence of firearms.  The mere suspicion that firearms might be present is, without more, insufficient to support a finding of exigent circumstances.  Santa, 934 F.2d at 1233 ("speculation, without any factual support, will not suffice to overcome the warrant requirement.").

The Government also contends the large quantity of drugs at the home and the steps taken to conceal it (including the known practice of drug traffickers to move drugs after an initial display) supports a finding of exigency. Again, without some indication that the suspects were contemplating moving the drugs, the mere fact that often drug traffickers do move the drugs is insufficient. The Government cites to the case, United States v. Reid, 69 F.3d 1109 (11th Cir. 1995). In Reid, law enforcement was told by a CI that a particular house was used as a cocaine stash house and that deliveries of the cocaine were being made out of the home. Id. at 1111. Some agents set up surveillance of the house, while other officers were in the process of obtaining a search warrant. Id. at 1112. The agents watching the home were told to stop any vehicles that left the house. Id. Before a search warrant could be obtained, two vehicles were stopped after being observed leaving the home. The individual in the first vehicle was released. Shortly thereafter, a white van entered the garage and the garage door was closed. It was at this time, law enforcement believed exigent circumstances existed in that they were concerned the drugs would be moved or an individual could abscond with some drugs on foot. The facts in Reid are distinguishable. Here, no vehicles or individuals were observed leaving the residences. While the Government contends law enforcement was concerned about the number of vehicles outside in that they would not be able to apprehend individuals had they attempted to leave, there is no evidence the suspects were planning to leave. Had someone made a move, which looked like they were attempting to leave, exigent circumstances would have then been present.

Finally, the Government argues that when the confidential sources did not return in ten minutes, the suspects would have become suspicious and would have taken

steps to either move or destroy the cocaine.  To support its claim that this is a valid

consideration for exigency, the Government cites <u>Santa</u> and points out that the Eleventh

Circuit did not consider this factor in <u>Santa</u> simply because no evidence was presented

to suggest how soon the suspects expected the CI to return.  While the Government is

correct that the Eleventh Circuit found the government presented insufficient evidence

to support a claim that the defendant would have become suspicious upon the CI's

failure to return, the Government ignores the subsequent section of the opinion holding:

> Even if we assume, however, that [the defendants] expected
> the CI to return to the apartment within a few minutes of his
> departure, the agents' warrantless entry of the apartment
> was unlawful.  This court has held that "a warrantless search
> is illegal when police possess probable cause but instead of
> obtaining a warrant create exigent circumstances."  <u>Tobin</u>,
> 923 F.2d at 1511 (citing <u>United States v. Scheffer</u>, 463 F.2d
> 567, 575 (5th Cir. 1972) (held that where customs agents
> planned a cocaine delivery and could have controlled the
> time at which it took place, the agents had no valid excuse
> for failing to obtain a search warrant) and <u>United States v.
> Munoz-Guerra</u>, 788 F.2d 295, 298 (5th Cir. 1986) (holding
> that where agents can get a warrant instead of revealing
> themselves and making immediate entry a foregone
> necessity, a warrantless search must be deemed
> unreasonable)); <u>see</u> <u>also</u> <u>United States v. Duchi</u>, 906 F.2d
> 1278, 1285 (8th Cir. 1990) (holding that evidence must be
> suppressed where the police created the exigency that the
> suspect would open a tampered package and destroy the
> evidence therein).

<u>Santa</u>, 236 F.3d at 671.  Similarly, here, law enforcement had complete control over the

time for the confidential sources to return.  They certainly could have arranged for the

sources to return in an amount of time which would have permitted them to obtain a

warrant.[5] As such, the officers created any exigency resulting from the confidential

source's failure to return and this cannot be used to justify the warrantless entry.

McGregor, 31 F.3d at 1069 ("exigent circumstances will not justify warrantless entry if

the exigency was created by those conducting the search").

In sum, the Government has not presented sufficient evidence to show that the

officers had an objectively reasonable basis to believe the destruction of evidence was

imminent. United States v. Miravalles, 280 F.3d 1328, 1331, n.4 (11th Cir. 2002)

("[e]xigent circumstances justifying a warrantless entry into a place of residence exist

where facts would lead a reasonable officer to believe that evidence of a crime is in

danger of imminent destruction."). Thus, the Government has not overcome the

presumption of unreasonableness of the warrantless entry into the two homes.

Therefore, the initial entry into the homes is illegal as a matter of law.

## C.    Independent Source Doctrine

Having determined the warrantless entry violated the Fourth Amendment, the

undersigned must now consider the Government's argument that even if no exigent

circumstances were present, the evidence seized should not be suppressed under the

independent source doctrine. (Doc. 67, pp. 16-17). Under the independent source

doctrine, "the challenged evidence is admissible if it was obtained from a lawful source,

---

[5]    Indeed, the testimony regarding what time the confidential sources would return is not entirely clear. Agent Clausen testified on direct that the source told Sanchez he would need to get the money from his source in Lake City. (Tr. 136:13-18). However, on cross examination, after a break for lunch, Agent Clausen testified the source told Sanchez he would return in ten minutes. (Tr. 159:21-22). The transcript of the recorded conversation between the confidential source and Sanchez is also unclear. (See Government's Exhibit 9). At one point, it appears the source says he will return in ten minutes. (Gov't. Ex. 9, p.26). However, subsequently, the undercover officer appears to be asking the source whether Sanchez was going to follow him to Lake City. (Gov't. Ex. 9, p.26).

independent of the illegal conduct, provided that the law enforcement officer's decision to seek the warrant was not prompted by the information gained during the illegal search." United States v. Hill, 2009 WL 2178046, *2 (11th Cir. July 23, 2009) (citing United States v. Chaves, 169 F.3d 687, 692-93 (11th Cir. 1999)). Where, like here, the search warrant affidavit contains information acquired as a result of an illegal entry, the court must look to whether the other information provided in the affidavit is sufficient to support a probable cause finding. United States v. Glinton, 154 F.3d 1245, 1254-55 (11th Cir. 1998). Accordingly, the undersigned must determine whether there was sufficient information in the search warrant affidavit, when any information learned as a result of the illegal entry is excised, to support a finding of probable cause. Next, the undersigned must evaluate whether the decision to seek a search warrant was influenced by any information learned through the illegal entry.

With respect to whether there was sufficient probable cause for the issuance of the warrant when the illegally obtained information is excised, the undersigned finds there was. The affidavits for both 230 and 228 provide the information learned from the confidential sources, including the fact that the confidential sources met with Sanchez and were told the cocaine was very close and not even a block away (from 230 San Jose Avenue). (See Doc. 67, Exs. A and B). The affidavits also detail the movements of the white Malibu in going between 228 and 230 San Jose and the proximity of those movements to the telephone call from Sanchez informing the confidential sources that the cocaine was now available at 230 San Jose. Additionally, the affidavits detail the confidential sources' actual observance of the fifty kilos of cocaine at 230. "Probable cause to support a search warrant exists when the totality of the circumstances allow a

conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). In this case, the warrant affidavits provided the judge with sufficient probable cause to believe both 228 and 230 would contain evidence of a crime.

Moreover, there is nothing in the record to suggest that law enforcement sought the warrants because of what they saw during the illegal entry into the homes. In light of the fact that the confidential sources personally observed fifty kilos of cocaine in 230, that officers believed the cocaine may have been at 228 and subsequently moved to 230, and that officers believed occupants of both 228 and 230 were working together, the undersigned "cannot say that the officers were prompted to seek a warrant based on what they had seen during the unconstitutional warrantless entry." Chaves, 169 F.3d 687, 693. As a result, the undersigned finds that evidence seized from both 228 and 230 was obtained from a lawful source (the search warrants), independent of the illegal conduct, and the officers' decision to seek the warrants was not prompted by the information gained during the illegal search."[6] Therefore, the physical evidence seized from 228 and 230 is not required to be suppressed.

D.    **Suppression of the Statements Made by Defendants**

Defendants also argue that the statements they made to officers should be suppressed as fruit of the poisonous tree. (Doc. 57). The Government does not address this issue. Defendants admit they were advised of their Miranda rights, but

---

[6] Similarly, to the extent Defendants may attempt to argue that agents conducted an improper search of 228 prior to obtaining the search warrant based on the testimony of Ms. Haddad (which the Court found to be not credible), such fails as there is no evidence the officers located or seized any contraband during that search. Indeed, no reference to any observations of contraband were included in the affidavit for the search warrant of 228. (Doc. 67, Ex. A).

argue that fact does not "dissipate the taint of an illegal seizure."  (Doc. 57, p.4 quoting Santa, 236 F.3d at 678).

Evidence, including verbal statements, obtained as a result of an unlawful entry are subject to exclusion.  See Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 416 (1963).  Although the purpose of the exclusionary rule is to prevent lawless conduct by law enforcement officials, it is not to be "interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons."  Brown v. Illinois, 422 U.S. 590, 600, 95 S.Ct. 2254, 2260 (1975) (quotation marks and citation omitted).  To determine the applicability of the exclusionary rule, courts must address whether the evidence sought to be suppressed was obtained by the "exploitation of that illegality or instead by means sufficiently distinguishable [from the illegal action] as to be purged of the primary taint."  Wong Sun, 371 U.S. at 488, 83 S.Ct. at 417 (internal quotations and citation omitted).  It is the Government's burden to show dissipation of the taint.  United States v. Bailey, 691 F.2d 1009, 1012-13 (11th Cir. 1982).

When a law enforcement officer obtains an incriminating statement "on the heels of a Fourth Amendment violation, the government has a substantial burden in establishing admissibility."  United States v. Seidman, 156 F.3d 542, 554 (4th Cir. 1998) (concurring opinion).  The government must show both that the statement was voluntary under the Fifth Amendment and that the statement was not obtained by exploitation of the Fourth Amendment violation.  Id. (citing Brown, 422 U.S. at 601, 95 S.Ct. 2254). With respect to the first issue: whether the statement was voluntary, as there are no allegations of threats or coercion and the Defendants were admittedly provided with Miranda warnings, the undersigned is convinced the statements meet the voluntariness

prong. See United States v. Delancy, 502 F.3d 1297, 1312 (11th Cir. 2007) ("a Miranda warning provides the notification of rights necessary to ensure that confessions are voluntary under the Fifth Amendment). The second requirement involves a showing that the connection between the unlawful conduct and the acquisition of the evidence was attenuated sufficiently to dissipate the taint. Seidman, 156 F.3d at 548 (citing Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266 (1939)). Courts must consider three factors in determining whether the taint has been purged: "[1] [t]he temporal proximity of the [illegal entry] and the confession, [2] the presence of intervening circumstances and, particularly, [3] the purpose and flagrancy of the official misconduct." Id. at 554 (quoting Brown, 422 U.S. at 603-04, 95 S.Ct. 2254 (citations and footnotes omitted).

Despite the fact that Defendants raised the issue of suppression of the statements in its motion (Doc. 57, p.4), the Government failed to respond and provide any argument that the taint of any illegal entry had been sufficiently purged to permit admission of the statements made by Defendants. At least one court has held, "[i]nasmuch as the government, which bears the burden on this issue, has articulated no basis for admissibility of [the statements], that evidence must be suppressed." United States v. Castillo, 2006 WL 522104, *15 (D. Me. March 1, 2006). Despite the Government's failure to address this issue, the Court will examine the Brown factors with respect to the instant case.

Initially, it is not entirely clear how many statements Defendants gave. Evidence was presented that Jones was questioned at least once, prior to the search warrant

being obtained. (Tr. 242:19-24). Defendant Hogan, on the other hand, appears to have been questioned twice – once before and once after the warrant. (Tr. 139:24-25, 140:1-4, 143:1-3). With respect to the first <u>Brown</u> factor, the statement by Jones and the first statement by Hogan were given while they were handcuffed outside the houses and while the officers were waiting for the search warrants to be obtained. As such, they were obtained in close temporal proximity to the illegal entry (i.e. within ten minutes of the illegal entry as officers testified they left the homes to obtain warrants within ten minutes (Tr. 139:8-19)). Second, there do not appear to be any intervening circumstances sufficient to purge the taint of the illegal entry insofar as these statements are concerned. The giving of <u>Miranda</u> warnings is not sufficient. <u>Santa</u>, 236 F.3d at 678 ("<u>Miranda</u> warnings do not, *without more*, dissipate the taint of an illegal seizure.") (emphasis in original); <u>see</u> <u>also</u>, <u>United States v. Guzman</u>, 2001 WL 950250, *6 (D. Kan. July 2, 2001) (court suppressed statements made after illegal entry and found <u>Miranda</u> warning did not purge taint). As for the third factor, there was no evidence presented to suggest that the officers' purpose in entering the homes was to obtain statements from the suspects. Instead, it is clear the officers purpose in entering the homes was to secure the evidence contained within. As for flagrancy, while the officers' forcibly entered the homes and hand-cuffed all the individuals inside, their behavior inside the home was not flagrant. The officers did not conduct a full blown search. Instead, they removed the individuals and waited for the search warrants before conducting the actual search. As such, the undersigned does not believe the officers' conduct in entering the homes was "flagrant," however, it was without legal

justification. See Santa, 236 F.3d at 678 (finding the Brown factors weighed in favor of suppression of statements where no significant lapse of time, no intervening circumstances, and agents' conduct was not "'flagrant' [but] had no legal justification."). As such, the Court finds the Brown factors weigh in favor of suppression and the statements made by Defendants Jones and Hogan before the search warrants were obtained should be excluded as fruit of the poisonous tree.

With respect to Hogan's statement after the warrant was obtained, the analysis is slightly different. While the exact time it took to get the search warrants was not clear, the Court assumes it was more than one hour. In any event, the fact that more time had passed does not, by itself, convince the Court that the taint of the illegal entry had been purged. The procurement of the search warrant, however, does appear to be an intervening circumstance. There was not any evidence presented that officers observed any illegal items upon entering 228. Unlike 230, where officers clearly observed a large amount of cocaine when they removed Sanchez and Defendant Jones, in 228 there was no evidence that there were drugs visible when agents entered and secured the house. This is also reflected in the search warrant affidavits. Where the affidavit for 230 contains reference to the cocaine observed, the affidavit for 228 does not indicate any contraband was seen. Additionally, when Defendant Hogan was first interviewed, she denied any knowledge of any illegal activity. However, after the search warrant was obtained, Hogan admitted her involvement with Sanchez. This indicates to the Court that it was not until the search warrant was obtained and Hogan knew the evidence would be located, that she decided to make any incriminating statements. Thus, the

search warrant was an intervening circumstance. Additionally, as noted above, the officers' conduct was not flagrant. As such, the undersigned finds Defendant Hogan's statement made after the search warrant was obtained was sufficiently purged of any taint from the initial illegal entry so that it should not be deemed fruit of the poisonous tree.

### III.  Conclusion

In sum, Defendants have standing the challenge the entry and searches at 228 and 230 San Jose Avenue. The Government has failed to show exigent circumstances and therefore, the warrantless entry into both 228 and 230 was illegal. However, the search warrants were independent sources and the suppression of any physical evidence located at either residence is not warranted. On the other hand, the statements by Defendants made prior to the issuance of the warrants are fruit of the poisonous tree and should be suppressed. The statement by Defendant Hogan made after the search warrants were obtained is not fruit of the poisonous tree and thus, is not required to be suppressed. Accordingly, it is respectfully

**RECOMMENDED**:

Defendants' Joint Motion to Suppress (Doc. 56) insofar as it pertains to physical evidence and to the statement by Defendant Hogan given after the search warrant was issued be **DENIED**. To the extent the Motion to Suppress addresses the statements given prior to the issuance of the warrants, the undersigned recommends it be **GRANTED** and those statements be suppressed.

**DONE AND ENTERED** at Jacksonville, Florida this __8th__ day of October, 2009.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Harvey E. Schlesinger,
United States District Judge

Counsel of Record